ELLIS, Judge.
This is a suit by the plaintiff against his employer’s insurer for compensation at the rate of $30 per week for a period of 364 weeks commencing Juné 28, 1952, with interest 'on each past due installment at the rate of 5% per annum and 12% additional as a penalty and $1,000 as a reasonable attorney fee, as a result of.an accident and injuries received by plaintiff on Oct. 19, 1951, and for which he was paid compensation until June 28, 1952.,
*380 After trial the District Judge awarded plaintiff compensation at the rate of $30 per week for one year additional, that is, from the time .the compensation .had been discontinued which was June 28, 1952, until June 23, 1953. All other demands of the plaintiff were rejected..
The case was appealed to this court and we remanded same for the purpose of permitting the plaintiff to take the testimony of Dr. H. Thorp Posey and D'r,. Homer D. Kirgis as to the electroencephalogram made of the plaintiff by Dr. Posey for the purpose of showing whether plaintiff suffered any brain damage as a result of his injuries, and reserved to the defendant the right to produce similar evidence, and after said testimony had been taken this case was to be disposed of according to law by the District Court. See 68 So.2d 666.
The case was retried in. accordance with the ruling of this Court and resulted in the same judgment by the district court as had been previously rendered. Both plaintiff and defendant appealed from the judgment.
The plaintiff contends that he is entitled to total permanent disability and is entitled to compensation for- such, while defendant contends that plaintiff had fully recovered on June 28, 1952, and the award of an additional year’s compensation by the District Court was erroneous and the judgment shoüld be reversed in this respect.
In the opinion rendered on the former appeal by this Court we. .generally outlined the evidence only insofar ;as was necessary to our decision of remand, and it is therefore necessary that the entire testimony taken on the first and second trials be reviewed.
The evidence shows that 'plaintiff had bee'n in the employ of the American Bituinuls- Asphalt Company for. more than twenty years and had always performed his work satisfactorily to; his employer prior to the accident .on-October 19, 1951. On-'the date’of the accident, a tank on a trück;"of Herrin -Truck Lines ..was being 'filled with hot asphalt and the plaintiff was standing on -the truck, when the tank exploded. Immediately after the explosion he'was found six or seven feet from the truck on the ground covered with the asphalt and unconscious. He was immediately taken to the laboratory building within about three minutes and it is shown that he regained consciousness immediately after arriving at the building. He was then taken to the hospital where he received immediate treatment by Dr. Louis 'Mayer in the operating room at Our Lady of-the Lake Hospital. Dr. Mayer stated that the plaintiff had been burned with a very thin coating of asphalt or asphalt derivative and he was so completely covered that it was necessary to put him to sleep after it had been ascertained that his blood pressure was satisfactory and he was not in-great danger as far as his burns were concerned, in order to remove the asphalt. The asphalt was removed with various solvents and he was then hospitalized, and several days later, due to the complaints of plaintiff about the left side of his face he was sent to x-ray where his face and left wrist were x-rayed.
Plaintiff was hospitalized for eleven days and was seen after that at Dr. Mayer’s office. Dr:'Mayer discharged him on December 17th to resume work as of December 19, 1951, with a note to Travelers Insurance Company, defendant herein, to the effect that he felt the fractures which had been discovered in the small bones of his face would be healed within six weeks and he did riot think that such fractures would interfere with his working. It was shown that three bones in the left side of- the face were fractured. Dr. Mayer stated that the burns which plaintiff received, while extensive, were of a secondary degree and were not too severe as plaintiff did not show the signs of toxicity usually shown. Dr. Mayer testified that as to the fractures of the small bones of the face, plaintiff was left with a depression of his left zygomaj the zygomatic arch. The doctor explained that-the zygoma is the bone you see right across'the side-of the cheek and it was- broken; in . two places, slightly depressed .-.but not enough to operate. The doctor stated that, plaintiff had some depression or fracture of the infra-orbital *381 ridge but that neither of the fractures were considered of sufficient consequence to operate to alleviate thém and, in fact, the fracture of the left maxilla was of “no concern.”
Dr. Mayer testified that the last time he saw plaintiff prior to the time he discharged him the ; latter complained only of discomfort in the region of the facial bones, and he told him that he thought that the same would pass in six weeks. He stated' that plaintiff’s complaints were not so severe the last time he saw, him as to give, any reason to believe they would not “go ahead and get well,” and he “could not go on about his business.” . ■
Plaintiff had a ganglion removed from, his left wrist which Dr. Mayer recalled as being present but he could not remember whether it was noticeable at the time. He had given him first aid. It is definitely shown, however, that this ganglion in no way left any permanent disability of the left wrist or arm. The only disability shown is as the result of a tight bandage-which plaintiff put around his wrist and. which he was told by the doctor to remove. There is no argument or claim of total disability with regard to the left arm.
Dr. Mayer further testified that plaintiff was quite cooperative the night he was brought in to the hospital and “if anything, was going out of his way to thank everyone concerned. He was 'awake by the time we got him back to the room. He continued that way and after he got out of the hospital and until I woüld say the last two weeks I treated him when there was some disagreement about the amount of discomfort he was having in his left wrist and in his face.” It was Dr. Mayer’s testimony that when he discharged plaintiff in December 1951 that he was fully capable of returning to work.
Dr. Mayer under cross examination further testified that the plaintiff made no complaints to him -of any loss of sensation in his face. In order to pin-point Dr."Mayer’s testimony as to the plaintiff’s complaint's, counsel on cross examination asked the doctor if on the last time he saw 'plaintiff, December 17, 1951, he was complaining of pain and discomfort on the left side of his face in the temporal region and also pain and discomfort in the left wrist, to which Dr. Mayer stated:
“The temporal region extends much . further. back down that anterior portion of the face. I gather his pain was right down a circumferential area, If you will draw a semicircle with the center of the semicircle at the outer canthus of the eye I think there was ..a semicircle with , a circumferential area of an inch and a half extending backward.”,, .
Dr. Mayer.could not remember plaintiff telling him that he could not go back to work, however, he admitted when he told plaintiff he thought he would soon be able to return to his usual duties, the latter replied : “I still hurt.”
Plaintiff further offered the testimony Of fellow employees showing that he was á regular, .capable and agreeable worker prior to the accident. Also offered on behalf of plaintiff was the testimony of the barber, who' visited him and had known him for a long time, and on these visits the plaintiff would complain of pain about his face and arm; He also stated tha,t plaintiff was nervous since the accident, “R'estless-like.” ' •
Rev.' Os'daf Livaus testified that he had known the plaintiff about five years and that he often visited him after ■ the accident, ánd that- plaintiff complained of “trouble with his head; He wouldn’t be able to stoop down.” The plaintiff’s insurance collector testified that usually when he went around, plaintiff would tell him that he was stiffering with his head and jaw and his arm.
Plaintiff’s wife testified of his splendid work record prior to the accident, and since then of his complaints of pain-and discomfort and 'that at times during some nights she would put hot pads on his face. She also testified that- when he stooped down 'his-head- bothered' him, >and. that he was irritable with- the children 'when, they *382 were playing around the house. His children were aged 10, 9, 8 and 3.
Dr. Leo Butler, general practitioner in the City of Baton Rouge, testified that the plaintiff was a patient of .his and that he had treated him prior to the accident and had known him 15 years. He first treated him subsequent to the accident on April 6, 1952, when plaintiff came into his office “complainins of pain in the left side of his face, headaches, and inability to fully open his jaws, pain in the left wrist and swelling of the hand and that he could not use his left hand good and stated that all came about since this accident.” Dr. Butler stated that the first thing that was noticeable about the plaintiff was “he had an 'Ace bandage on his left wrist and hand and when I removed the bandage his left hand was greatly swollen and to that extent he could not close it so well. I tried to get him to close it, but he could not fully close it. He had a slight ankylosis of his jaws. He could not open his mouth fully. I tried to pry it open. The motion was limited and I saw burns on both arms, healed burns, and that was about the extent. There was a little scar on the left side of his head, the left side.” He reiterated that plaintiff’s complaints were “pain in the left side of his face going up toward his eye up into his head, and that was not all the time, but every once in a while it occurred. It was greater sometimes than others.” Dr. Butler prescribed infra-red lamp on the side of his face with massage of an analgesic ointment and gave him some tablets for pain and nerves as plaintiff seemed to have been upset from “a nervous standpoint.”
This doctor further stated that he had seen the plaintiff at periodic intervals of every week since then and that his complaints were the same. He did state that plaintiff does not have so much pain but that it is sufficient for him to complain about and that the pain do.es not seem to be as often although plaintiff told him that he could not sleep at night and the doctor still prescribed sedatives “to keep his nerves down.” He thought the .plaintiff had made progress. Dr. Butler testified that plaintiff complained .of loss of sensation, in the area tied into the fifth nerve on the left side of his face and that he thought plaintiff was sincere in his complaints. He did testify that eventually plaintiff would be all right but that he could not tell when that would be. Dr. Butler under cross examination diagnosed the condition that causes the pain in plaintiff’s face of which he complains as neuritis, which he stated meant painful nerve, which he believed could “be possibly caused by the accident, just facial neuritis.” He stated that his diagnosis was based entirely on plaintiff’s complaints to him.
The plaintiff testified in his own behalf that on the day of the accident he was up on one of the long trailer trucks which had a tank on it and that where he was standing was about 12 or 13 feet above the ground. All that he remembered was when he woke up in the hospital. He stated that Mr. Adams, plant manager for his employer, showed him where he was found right after the explosion and it was between 27 and 30 feet behind the truck. Mr. Adams himself testified that plaintiff was lying six or seven feet back of the truck. Plaintiff’s testimony as to his consciousness is at variance with the testimony of Adams who stated that he regained consciousness in the laboratory and that it took about three minutes to remove him there from the scene of the explosion. Plaintiff testified that he was treated by Dr. Dowell and by Dr. James Coffee, Dentist, who pulled one of his upper teeth on the left side. He stated that he had been examined by Dr. Ban-nerman and Dr. Foreman and had also been to Oschner’s Clinic where he had been examined by Dr. Homer Kirgis,
Plaintiff stated that at the time he was discharged by Dr. Mayer he told the doctor that he could not put his head down as it ached him, and he could not open his mouth as it caused him pain and was sore. He also stated that he asked the doctor “What are you going to do about my wrist?” and at that time he testified he was not able to return to work. He stated on the first trial on the 16th of December, 1952 and on the 17th of March 1953, that his wrist and head bothered- him. As previously *383 stated, there is no disability claimed to the left arm, however, at that timé it was evidently bothering him as he had put a tight bandage around his wrist which caused it to swell. The plaintiff pointed out the site of pain on the left side of his face approximately between the left eye and left ear and described it as “something like a toothache and if I bow my head- too many times the pain gets right in here.” He stated that the pain “comes and goes,” and that he took pills which Dr. Butler prescribed for the pain. The plaintiff testified that he had not tried to do any kind of work, light or heavy, around home or elsewhere for the reason that he was not able for it brought on pain in his head if he stooped over.
On March 17, 1953, the trial of this case was resumed with the testimony of Dr. Duane Foreman, specialist in the field of neurosurgery^ who stated that he had exam-amiñed the plaintiff on four occasions.
“On the first three occasions of examination I obtained a history of CoN nelius of his injury,and the symptoms that persisted after the injury, of the treatment that he had obtained, and performed a neurological examination. That’s the extent of my dealings at the time of the three first examination. I repeated my neurological examination and obtained an interval history on the two latter' visits. On the fourth visit, when I saw him recently, I inquired about his symptoms during the interim and performed a limited examination confined to the head and neck. Now, did you ask me. about my findings ? •
“Q. Yes? A. Well, I obtained a history of the- explosion and the injury including fractures of the facial bones on' the left side burns, mild concussion, and according to the patient he had had persistent pain in the left side of the face and left side of the head which had caused him complete disability. The pain was more or less constant and moderate in severity but was aggravated by over-heating, exertion, bending over and by cold breezes to his face. He said that he had been unable to carry on any appreciable physical activity because of the aggre-vation of his pain. On- examination he had an area of numbness over the left side of his face which included the left upper lip and gum and the central portion of the left cheek. On a second examination the area of numbness was found ‘to include the entire left side of the face and the upper portion of the left side of his neck. On the last examination in February the numbness was still present, but in the limited distribution that I mentioned first, the middle of his face. ' He had swelling over the left maxillary region and tenderness to pressure over the left side of his face at the site of swelling and—
“Q. Excuse me, did you state that that occurred on all examinations? A. . That occurred .on all examination: He had tenderness to pressure over the left temporal region extending up into his scalp. During the first three examinations in May he was unable to open his mouth more than half, or three-quarters of the way because of pain. I may be getting the testimony confused by skipping back and forth, but I am trying to get all: the positive points of findings and date the ,'ones that were-jound on only one occasion. On the 'last examination, the most recent one, he had movement at the side of the fracture of his left zygomatic arch on opening his jaws. These were the positive findings in the area of the site of his symptoms.”'
Dr. Foreman stated that he could feel a slight movement in the area of plaintiff’s left jaw in which the x-ray formerly showed the fracture to have existed, only when he opened his. jaws and this was .the particular point plaintiff claimed to the doctor was the site-of his greatest tenderness and much of his pain. The doctor explained that the area of numbness which he found in the left area of plaintiff’s face was served by the fifth cranial nerve. He tested for numbness in this area with light pin scratch *384 and pin prick.' The doctor'testified that the swelling which he did not mention in his report was unquestionably present ’in'his examination of February and it was over what is commonly called the-cheek bone, and it Was limited to an area of about an inch and a half in diameter.
As a neuro-surgeon Dr. Foreman attributed the cause, of the plaintiff’s pain probably to two sources,., soft tissue irritation at the site ,of his un-united -fracture, and another source would be at same time an arteritis of the left temporal artery. It was his opinion that originally plaintiff had a good deal of pain and discomfort over the entire left temporal region and perhaps over. the left side of his face, from the bruising of the tissues from the blow, however it should have disappeared over a month or two, and it was his opinion that if the. persistence of the pain was genuine it would indicate this arteritis and involvement of the temporal artery to be in a state of irritation and recurrent - or persistent irritation of the soft -tissues of his face “from the un-united fracture.” The doctor was asked whether such a condition of pain- -would be a- disability from performing manual -labor and he answered: “No, sir, not that I can’see.” It-was shown- that plaintiff’s- fractures to the bones of the face had not united. This doctor- testified.that even if they had united plaintiff had the other possible source of pain which' he called arteritis, and he thought probably that area-of his pain, the throbbing pain in his left temporal area, might be .causing most of the pain. He stated that arteritis is caused by an inflammation of an artery and also by trauma to the. artery wall. The doctor’s prognosis for arteritis such as plaintiff'could have-had was, he thought, good'for eventual recovery. He had known the arterial pains to last for months but he had not seen one that lasted over a month or tvroj and he felt quite sure that the condition would eventually clear up. The doctor’s impression of the plaintiff was given in'the following testimony: " - '
.“He impressed me. as having-genuine- : pain,; also -with .perhaps being more or,,, less pre-occüpi'ed-, with his pain,. fex-r -. - tremdly nervous and apprehensive about. ' the possible, harm .that, would come to -him in the future from his symptoms ' such as -strokes, perhaps other future harm that would Come, and he was. more or less obsessed,, with the idea at the times I saw him. I would say abnormally--pre-occupied with his pain and for that reason I think there was a neurotic element o.-f some degree in the , severity of his symptoms.
“Q. Doctor,-if . Cornelius is sincere and honest in his complaints would it be, your opinion that condition would disable him front doing hard-laborious work at this time ? • A.. If his complaints were genuine and not exaggerated it would be disabling since he • claims that- they are disabling.
“By the Court: Q. Would you say totally, partially ? A. I would say that it is likely that a person with severe vascular pain that was aggravated- by overheating and , exertion, it is possible would be- prevented from carrying on heavy, physical work.”
♦ * * . * * *
“Q. Doctor, I understand your testimony with respect to the disability of Betz to be that assuming that his symptoms were-sincerely stated to you that Betz is disabled to perform manual labor because he says so. Is that correct? A. Yes,—
“Q. I further understood 'you to say—
“Mr. Spaht: The doctor has not finished.
■ “A. That speaks for itself. If I am going to take his word as genuine theñ I will have to assume he is disabled because he says so.
“Q.. I further understood you to say, sir, that in your opinion Betz was somewhat neurotic and that the severity of his symptoms was in your opinion attributable to some extent to. that condition,, is that right? A. Yes..
*385 “Q. Doctor, in your report of May 27, 1952, you state in the last sentence of that report ‘I find no residuals from the injury to his face which should cause. disability’. I don’t understand that you have changed your’ opinion with respect to that statement, is that right? A. No, I haven’t changed my opinion * * *”
Dr. Homer D. Kirgis rendered a report on September 10, 1952, as the result of an examination made in August of 1952, in which he stated that this patient presented a chief complaint of “pain in the left side of the head.” This report shows that plaintiff stated that on- Oct.- 19, 1951, while assisting to load a tank on a truck it exploded and caused him to be thrown “twenty-seven feet”, and that he was rendered unconscious for 12 or 15 hours. Plaintiff also told Dr. Kirgis that “some bones on the left side of my face were fractured.” Plaintiff’s greatest discomfort was indicated by him to be in and about the left temporoman-dibular joint, and that the attacks of discomfort were precipitated by yawning, eating and stooping so that the head is dependent. Plaintiff is also reported by-this doctor to have told him that his wrist was broken at the time' of the injuries and that he had not improved during the past six months. He also states in his report that plaintiff apparently takes little if anything for the relief of pain. Further, that he had gained 8 or 9 pounds but that he had not worked since the injury as such activity precipitated attacks of severe discomfort. This doctor stated that his neurological examination was negative except for hy-poesthesia in the second division of the fifth nerve on the left. There was questionable evidence of a slight weakness of the muscles of the left side of the face. The pupils of the eyes were found to be very small and dilated only slightly when the intensity of the light was reduced. The blood pressure was 150/90, and pulse rate 76. Dr. Kirgis found a mild degree of prominence of the tissues of the left zygomatic area, which refers to an area of the fractured bones in the face. X-ray films of the skull and tem-poromandibular .joints were made and found to be normal,. in other words, there was no evidence' of injury-to the skull or any abnormality of the joints of the bones of the temporal joints which-was the area of .alleged discomfort. As a result of this examination as shown , by- the report, Dr. Kirgis states:
“If the history is accurate, I would consider that this patient sustained a cerebral concussion or cerebral contusion at the time of his injury, In addition, he traumatized the second division of the fifth cranial nerve on the left.”
Dr. Kirgis suspected that plaintiff would continue to complain of a moderate degree of discomfort for several more months, however, he would, be in favor of plaintiff being as active as possible without causing undue exascerbation of his symptoms. He did not-think that plaintiff should be given a permanent disability rating at the time of the report for he stated that he did not anticipate that he would have any permanent disability as a result of his injuries. He recommended that if plaintiff’s symptoms persisted and he was unable to return to work after three more months had passed that he would be glad to see him again.
It will be noted that there are three errors in the history which plaintiff gave this doctor, two of which appear important as evidence by the testimony taken on the remand and which will be discussed later. These errors consist of'a statement by plaintiff that he was thrown 27 feet and rendered unconscious for 12 or 15 hours, and that his wrist was broken at the time of the accident. The last error as to the wrist being broken is of minor importance as no disability is-claimed as -the result of any arm injury. -It is-also important to note at this time that plaintiff presented a chief complaint of pain in the left side of the head, and x-rays of the skull and joints of the left temporal region were normal.
'Dr. Kirgis apparently testified by way of deposition on Nov. 19, 1952, which was in the record, on the first appeal considered 'by this court but is not now in the record. From the summation of his testimony taken by way of deposition, in the opinion on the first appeal it was to the effect that so far *386 as a neurological examination was concerned there was no evidence of plaintiff having sustained permanent damage to the brain from a cerebral contusion or cerebral concussion which he thought he sustained but from his behavior he suspected that there was some residual from it. The report of September 10, 1952, covers the examination of which Dr. Kirgis testified on 'November 17, 1952 and, therefore, it is not necessary that we delay a decision in this case by a further remand to secure this missing testimony.
This constitutes a discussion of all testimony adduced on the first trial other than the above mentioned report and a report of Dr. Bannerman, Dr. J. Wallace Dowell, Dr. James L. Coffee, Dr. J. Ralph Phillips, Dr. Jos.eph P. Tomsula, radiologist, Dr. Dean W. Geheber, radiologist, all of which were introduced on the first trial and will not be discussed.
Dr. Bannerman, orthopedic surgeon, examined the plaintiff at the suggestion of his counsel and his report is dated March 21, 1952. ¡He states that the plaintiff told him that as a result of the explosion he sustained many injuries about the body, the most severe óf which was to his left wrist and jaw. Dr. Bannerman found the plaintiff quite cooperative and he “appears not to be in any acute pain”. He made an examination of the left wrist which it is not necessary to rehash here.. Dr. Bannerman stated: .
“Examination of the jaw shows a slight loss of range of motion of the jaw and slight tightness of the muscles on the left side. The left side also is somewhat prominent. However, the jaw articulates well and on closure seems to go through its normal range of motion.”
An examination of x-rays previously made on the plaintiff were reviewed by this doctor, and as to the wrist he found them negative for any type of bone or joint pathology. There were two sets o’f x-rays of plaintiff’s jaw, the last showing healing of the fractures in excellent position with a normal range of motion in both temporal and mandibular joints. The x-rays showed a multiple fracture of the left side of the face. Under the heading of comment, Dr. Bannerman stated:
“Insofar as the wrist injury is concerned, I feel that Cornelius is making satisfactory progress. It should be only a matter of time before full function returns. It is my belief that he can go back to his normal work at the present time and over the next three to four weeks should have a return of strength and should be able to handle anything satisfactorily then. Examination otherwise reveals a healed fracture of the left side of the face involving the zy-goma as well as the neck of the mandible with some fractures of the mandible itself. He seems to be making satisfactory progress insofar as these fractures are concerned and over the next several months should regain normal motion. It is quite possible that some minor dental work in the way of further extractions may be "necessary before treatment is complete. However, I feel the strength in the jaw is sufficient for normal occupation.”
Dr. Willard Dowell, orthopedic surgeon, gave a written report on March 12, 1952, as the result of an examination of the plaintiff. In this report Dr. Dowell stated that plaintiff complained of pain in his jaw and that he was unable to open his mouth as far as he previously could. Plaintiff also complained of stiffness in his left wrist and pointed out a small mass in his wrist which appeared to be a small ganglion and which the doctor removed on February 12, 1952. Dr. Dowell in this report recommended that the patient see Dr. James L. Coffee, dentist, in regard to his jaw injury, and stated that he deferred any opinion as to permanent disability until maximum improvement had taken place for at that time plaintiff was still under follow-up treatment in regard to the removal of the ganglion. Thus we see from this report that Dr. Dowell evidently placed small importance to the jaw condition.
We find another report of June 12, 1952, by Dr. Dowell, who stated he had examined *387 tlie plaintiff on several occasions “recently.” He stated that it should be noted that plaintiff did not return for follow-up visits between March 11, 1952 and May 22, 1952. At the time of Dr. Dowell’s examination of May 22, 1952, plaintiff had wrapped'an Ace bandage rather tightly around his left wrist which the doctor stated had caused a swelling of the dorsum of the left hand, and he advised plaintiff to remove this bandage as it was both unnecessary and causing considerable swelling of his hand. The doctor stated that on his last visit plaintiff still said he had wrapped the bandage around his wrist as he had struck his wrist and felt that his wrist needed support, and that he again recommended that the bandage be removed. Dr. Dowell stated that the patient had always stated that he had a fracture in his left wrist but none could be ascertained or noted on any x-rays. He stated that the patient’s disability in his left wrist was on the basis of disuse. He recommended active use of his wrist and felt that improvement would depend on his determination to use his wrist. He stated: “I have explained.to him repeatedly that he has no fracture in his wrist. I feel that he is not capable of doing full duties at this time, but feel that he is capable and should be returned to light duties as this would be of definite benefit to him.”
From these reports it is to be noted that Dr. Dowell was mainly concerned with the plaintiff’s left wrist and any disability which he felt existed arose' from that source. In neither report does he discuss any disability as the result of alleged pains in the temporal region.
Dr. James L. Coffee, oral surgeon and exodontist, of Baton Rouge, La., examined plaintiff on December 21, 1951 and rendered a report on February 26, 1953, in which.he stated that he found a slight depression of the left Malar bone and a prominence over the left zygomatic arch which was tender on pressure. He also found a grinding or popping noise and a vibration to touch which produced pain when the patient opened his mouth, and also found a loss of sensation to the upper part of the left side of the face and left side of the upper lip which, in his opinion, was the result of injury to the sensory branches of the 5th cranial nerve supplying this area. He removed the Upper left first bicuspid. He stated:
“I do not see any reason why this should prevent the patient from resuming work.
. -“I also examined him on Feb. 17, 1953 and at this time there were no changes in my findings of the first examination.”
Dr. J. Ralph Phillips examined plaintiff on the 13th of June, 1952 and stated in his report of June 20, 1952, that from an eye, ear, nose and throat standpoint the plaintiff “is able to resume his job.” We also have a report of Dr. Phillips dated January 18, 1952, resulting from an examination on November 16, 1951, in which he stated:
“There is a fracture in the inferior rim of the orbit. The position of which is good and I do not believe it is giving the patient any symptoms.”
“It is my opinion that thé injury that Cornelius Betz received in October, 1951 did not cause any permanent damage to his eyes and is not the basis of the error of refraction.”
We also have a report from Dr. Phillips dated October 25, 1951, as the result of an examination on October 22, 1951, made at the request of Dr. Charles McVea and Dr. Louis Mayer. This referred to an examination of the eyes, and ears of Cornelius Betz in which the doctor stated:
“It is my opinion that there will be no permanent disability to the eyes or ears from this injury.”
Dr. Joseph P. Tomsula, radiologist, submitted a report with regard to. the x^rays of the left wrist of plaintiff which is of no importance.
Dr. Dean W. Geheber, radiologist, rendered a report on October 26, 1951, with regard to the facial bones and left wrist of the plaintiff in which he stated that an examination of the facial bones shows frac *388 ture lines to extend up across both the anterior and posterior portions of the left zy-goma, Some fragmentation was present at the posterior' fracture line but only a moderate degree of depression was present; He also found a fracture present in the interior margin of the orbit on the left and some fragments are depressed. He stated that the fracture involved the lateral wall of .the left maxillary sinus. In his report of December-19, 1951, Dr.- Geheber found nothing contrary, to his previous findings. On June 17, 1952, he stated that the left temporomandibular joint was normal.
This constitutes all of the testimony before this court on the first appeal and upon which the lower court based its judgment awarding plaintiff compensation for twelve months in addition to the compensation previously paid. From a consideration of the testimony it would appear that there was no manifest error in the judgment of the lower court and that he was very liberal in awarding an extra 12 months. The only complaints which the plaintiff had up to the second trial were with regard to his left wrist, which it is now'contended is not the basis of the claim for total disability, but that the basis for same is now one of brain damage and a complaint of pain in the left side of the head and temporal region. The pain is understandable in view of the fractures, ’ but there is testimony that plaintiff may have been imagining the severity of his pains and was somewhat neurotic.
It must also be remembered that Dr. Kir-gis based his findings of either cerebral contusion or cerebral concussion upon the accuracy of the plaintiff’s history and particularly upon the violence of the explosion and the distance of “twenty-sev.en feet” plaintiff stated he was thrown, together with the statement of plaintiff that he was unconscious fifteen hours, both of which claims were greatly in error.
Considering the testimony up to this point, there is no manifest error in the judgment of the district court, however, on the 23rd day of May, 1953, Dr. Kirgis rendered a written report to counsel for plaintiff which was annexed to a motion to remand and which became the basis of the remand of 'this case to the District Court in order that the plaintiff might be permitted to take the testimony of Dr. H. Tharp Posey and Dr. Homér D. Kirgis as to the electroencephalogram made of the plaintiff by Dr. H. Thorp Posey, for the purpose of showing whether plaintiff suffers any brain damage as the result of his injuries and reserving to defendant the right to produce similar evidence. This procedure was followed and as stated the District Judge rendered the same identical judgment and the case is back before this court on appeal.
It might be well in discussing the-testimony taken on the remand of the case to' begin with Dr. Kirgis’ report of May 23, 19.53, which formed the basis of the remand.
In this report Dr. Kirgis stated:
“I first examined this patient on 8/26/52, at which time he presented a complaint of ‘pain in the left side of the head.’ At the present time the patient presents the same complaint. The history of his injury and the subsequent reaction to the time of my first examination was outlined in my first letter.”
A reference to his first report, referred to by him as a “first letter” which is discussed more or less in detail heretofore was dated September 10, 1952. It is well to bear this in mind as Dr. Kirgis’ opinions are based upon the history included in the information given by plaintiff and, as shown in this September 10th, 1952 report, given as a result of his examination on 8/26/52, and which history was in error in three respects, two of which are most important in substantiation of Dr. Kirgis’ opinion of brain damage.
Dr. Kirgis in the report of May 23, 1953, states that plaintiff reported to him that the attacks of pain had become “slightly more severe and more frequent,” and that he suffered some degree of discomfort at all times, and that there were two or three exacerbations of this discomfort each day which continues for two or three hours, and plaintiff told the doctor that this discomfort was so severe that he could not work.
*389 It is important to note in this report that Dr. Kirgis states:
“The neurologic examination is unchanged from that recorded at the time of my first examination. That is, the examination is negative except for hypo-esthesia in the second division of the fifth nerve on the left. There also is evidence of a slight degree of paresis of the muscles of the left side of the face. At the present examination the blood pressure was 160/92 and the pulse rate 76. In view of his continued difficulty I requested that an electroencephalogram be made.
“It was reported as follows by Dr. H. Tharp Posey: ‘Amplitude, Asymmetry, temporal, awake and asleep, left temporal down, moderate. Very strongly' suggestive of localized brain damage.’
“This report in conjunction with his, history of unconsciousness following the injury as well as his reaction subsequently would suggest that he sustained a cerebral contusion at the time of the injury. The .contusion, , as judged from the electroencephalogram, was sustained at least mainly by the left temporal lobe of the brain.
“I explained to the patient that although he continues to be uncomfortable, there was no evidence to neurological examination that he would become worse if he returned to work. I encouraged that he do so, even though he had to confine his activities at first to a light type of work. I have at no time thought this patient was malingering and the electroencephalogram supports this conclusion. I feel that he will continue to have some degree of discomfort for a rather long period in view of his reaction to date.”
We thus see that the patient from August 25, 1952, to May 23, 1953, presented the same complaint of a pain in the left side of the head to Dr. Kirgis, and we also see that the result of his neurological examination was unchanged in that it was negative except for the nerve hypoesthesia which is not connected by this doctor with the brain damage but due to the fracture and alleged injury to the nerve. We next see that the doctor states that there is evidence of a slight degree of paresis of- the muscles of the left side of the face. In his first report of September 10, 1952, he stated there was “questionable” evidence of a slight weakness in the muscles of the left side of the face. In the report of May 23, 1953, the blood pressure had increased.
Dr. Kirgis, in view of the plaintiff’s “continued difficulty” which consisted of his complaints of pain in the left side of his head requested Dr. Posey to make an electroencephalogram. Dr. Kirgis in this report also states that Dr. Posey’s report was strongly suggestive of localized brain damage “in conjunction .with his history of unconsciousness” which plaintiff told Dr. Kirgis amounted to some 12 or 15 hours and which, in fact, amounted to an estimated three minutes, “as well.as his reaction subsequently would suggest that he sustained a cerebram contusion at the time of the injury.” By his “reaction subsequently” is understood to be his complaints of pain which are admittedly subjective, that is, subject to the will of the plaintiff. There is n<? way to prove or disprove plaintiff’s complaints of pain.
It will also be noted that Dr. Kirgis at ’ this time encouraged plaintiff to return to some kind of’work even though he had to' confine it at first to light work.
In connection with Dr. Kirgis’ testimony given in a deposition on February 17, 1954, there was offered in evidence another report by this doctor dated December 10, 1953, in which he states:
“This patient continues to present; the complaint of ‘pain in the left side of the head’ and in addition to this complaint he also complains of ‘soreness of the eyeballs and attacks of roaring in the left ear.’. There also is. a complaint of ‘soreness of the heart.’ ”
Dr. Kirgis further states in this report that plaintiff, in addition to an increase of plaintiff’s discomfort with exertion, also had *390 what he described as a sensation of aching and soreness in the retrosternal area (heart area) with exertion sometimes accompanied by a roaring sensation in the left ear. The patient claimed to be quite nervous, tense and irritable since the accident in which he was injured but stated that the symptoms were said by the patient to be considerably worse than previously. Plaintiff also reported to the doctor that his appetite had continued to be quite poor since the injury and “he feels that he has lost approximately 20 pounds of weight.” According to this report, plaintiff’s blood pressure was 162/94 and pulse rate 84. He found the same objective symptoms which, however, other than possibly the slight tenderness or paresis in the muscles of the left side of the face, were not connected with the suggested brain damage. The only symptoms substantiating the suggested brain damage were the nervousness, irritability, pain in the left side of the head, all of which are subjective. Dr. Kirgis in this report states that “the objective neurologic findings should not prevent this patient from returning to work” although the persistent evidence of injury to the left trigeminal nerve suggests that he has an organic lesion which is the basis of his pain, and he states that, additionally, must be considered the evidence of localized damag'e to the brain demonstrated by the electroencephalogram.
It is to be noted that by the report of December 10, 1953, plaintiff’s subjective complaints had increased from pain in the left side of his head to soreness of the eyeball and attacks of roaring in the left ear and soreness of the heart. When this doctor testified he stated:
“The patient has continued to present the same complaints, that is, pain in the left temporal area, left side of forehead, of attacks of dizziness and of being unduly nervous and irritable. The attacks of pain in the left temporal area and the left side of the forehead are often referred to by the plaintiff simply as ‘headaches.’ * * *
“So the complaints have remained essentially unchanged. The neurological examination has also remained unchanged, and in fact, consist essentially, as far as evidence of organic lesion of the central nervous system or of the nervous system of the hypo-esthesia in the distribution of the maxillary division of the fifth cranial nerve on the left. In addition, there is a distinct prominence of the left zygomatic arch, which apparently is the site at which the greatest force of the blow to the head was received.
“The original impression was that the patient has sustained a cerebral concussion or a cerebral contusion at the time of the injury, and, in addition, had received trauma to the second division of the fifth cranial nerve on the left. The complaints of headache, dizziness, lack of energy, undue irritability, and nervousness are a set of symptoms which constitute what we call the post cerebral concussion or post cerebral contusion syndrome and are frequently seen following head injury, sometimes of an apparent minor nature. It is my feeling that this patient is presenting that type of syndrome, plus the evidence of damage to the second division of the fifth nerve on the left, plus the evidence of local trauma to the tissues as is evidenced by the prominence in the left temporal area and as also evidenced in x-ray films made on 12-4 — 53 of the temporal mandibular articulation in which there was evidence of restriction of excursion of the left mandibular condyle.
“In regards to the appearance of the electroencephalogram, it is my impression that the altered electroencephalogram is additional evidence of trauma to the brain as a result of the injury.
“Q. Then, would you say that the results of this examination which Dr. Posey gave you with this machine, confirmed what you had previously thought perhaps resulted? A. Yes.
“Q. From this accident? A. Yes, sir. The diagnosis of cerebral concussion, or cerebral contusion, when you examine the patient several months *391 after the injury, is dependent somewhat. upon the accuracy of the history which is presented. You will notice, if the first history presented is accurate, I would consider the patient had sustained a cerebral concussion or a cerebral contusion. The finding's of the electroencephalogram confirmed the accuracy of the history, indicates that the history was accurate.
“Q. Yes, sir. A. And that my diagnosis now would not be cerebral contusion or cerebral concussion, but that he had sustained a cerebral contusion which is the more serious type of brain injury.
“Q. Is it the general concensus or feeling in the medical profession that the results of the electroencephalogram are accurate and can be relied upon? A. It is generally accepted, yes. It is considered to be an accurate means of determining damage to the brain.”
Dr. Kirgis has repeatedly, stated that he believed the plaintiff to be sincere in his complaints. Further on in this doctor’s testimony he stated that the roaring sensation in the left ear which plaintiff complained of was not believed by him to be directly secondary to the injury but that it did constitute a complaint about which he had referable to his head. He then went on to state:
“In addition to that, I think an index of the sincerity of his complaints can be obtained by the change of weight which has occurred. He has lost approximately twenty pounds of weight since the injury.”
Dr. Kirgis had to admit on cross examination, and the reports which have been quoted will show, that the plaintiff at no time had made any complaints of dizziness, nor had the doctor in his previous reports or testimony 'mentioned lack of energy, undue irritability or nervousness other than in his report of December 10, 1953, more than two years after the original accident and injury and some fourteen months approximately subsequent to this doctor’s first examination of plaintiff. It is also to be noted that Dr. Kirgis connects the complaints of headaches, dizziness, lack of energy, .undue irritability and nervousness with the suggested brain injury and states that the diagnosis of cerebral contusion or cerebral concussion is dependent somewhat upon the accuracy of the history presented, and, as heretofore shown, the main history which was given by plaintiff to this doctor and which would have a serious connection with a brain injury, was erroneous. As a matter of fact, the medical testimony shows that the length of unconsciousness or coma, which is the same thing, is most important in arriving at a correct conclusion of brain injury or not. Dr. Kirgis’ conclusion is based upon twelve or fifteen hours of unconsciousness which is incorrect, and therefore the history was not accurate. In addition he bases the sincerity of plaintiff’s complaints upon the change of weight which occurred from the time of the accident to his last examination of December 4, 1953, which he stated was a loss of 20 pounds of weight. This is definitely shown to be in error as plaintiff previously had told him he had gained some eight or nine pounds, and when shown this in one of his previous reports, this doctor stated: “Well, he must have meant he lost 29 pounds,” which was completely inaccurate as shown by the written reasons of the district court wherein it stated that the plaintiff “testified that his normal weight was about 168 or 170 pounds and when weighed on April 1, 1954 when he last appeared in Court, instead of having lost 20 pounds, he weighed 17814 pounds, which was a gain of about 8 pounds.” Thus, this reason given by Dr. Kirgis as proof of the sincerity of plaintiff’s complaints is completely destroyed.
Under cross examination Dr. Kirgis admitted that the injury to the fifth cranial nerve on the left side might be irritating and causing some discomfort but that it should not constitute any particular disability and often it doesn’t constitute a source of complaint. Dr. Kirgis also testified that plaintiff complained of pain in the left side of his forehead as well as in the left side of his face and stated that the fifth nerve on the left side supplied the left *392 side of the face and from this we understand that the pain in the left side of the face had no connection with the suggested brain injury. He stated, however, that the pain in the left side of the forehead was not in the distribution of the injured fifth nerve and that it constituted a part of the contusion syndrome of symptoms. An examination of prior complaints of the plaintiff as given to this' doctor does not reveal a complaint of pain in the left forehead but of pain^ in the left temporal region between the eye and the ear. Dr. Kirgis testified that the two most common components of the so-called post cerebral contusion syndrome' were headaches and dizziness. He then admitted under cross examination that he did not have any record in any of his notes as the result of his previous examinations -of a complaint of dizziness. Pie admitted, and an examination of the reports which he gave in this case will show, that he did not mention the word “dizziness” prior to the trial. He stated that the state which a patient usually described as dizziness is really a sensation óf unsteadiness. There is no suggestion in his testimony that the plaintiff was actually “unsteady” or that he was tested for this particular complaint. Dr, Kirgis, also under cross examination, stated that his opinion of the case had not been changed to any great extent by the electroencephalogram which had been made by Dr. Posey. He stated that he still represented to plaintiff that there was no evidence that he would become worse if he returned to work and he even encouraged him to do so. He again reiterated under cross examination that if the history of plaintiff was accurate he must have sustained a cerebral concussion or contusion, which would imply that if the history were not accurate he would be of a different opinion. Dr. Kirgis testified that the examination of plaintiff’s eyes which revealed some abnormality to light reaction had no significance in evaluating his condition as a result of the accident, but might indicate the existence of some. infectuál disease which would be disconnected with the accident. ,He stated that: “The electroencephalogram wouldn’t indicate that the patient could not return to work. It .merely indicates that he did have-a cerebral-contusion.” He also stated ■ that he did not .think that plaintiff would become worse if he returned to work but he did not personally think he could perform heavy work at the present time as he believed the plaintiff was not malingering and that he was showing genuine complaints. He thought, however, that it might be possible for plaintiff then or in the near future to perform light work and he was somewhat optimistic in plaintiff’s ability to perform light work. He doubted that he would ever be able to perform heavy work. When questioned about this he summed it up by saying that he had changed his opinion somewhat due to the fact that the plaintiff several months later returned with the same findings and same complaints and naturally he had some additional complaints. Essentially, he stated, it was the same neurological picture, which objective neurological findings would not prevent the plaintiff from returning to work.
Summed up, his testimony is based upon plaintiff’s history as given to him together ■with plaintiff’s subjective complaints and the objective findings shown by the electroencephalogram. On re-direct examination Dr. Kirgis stated: “ * * * The objective findings in this case, in themselves, would not necessarily prevent the plaintiff from returning to work.”
Dr. Posey gave his testimony by way of deposition on the same day as Dr. Kirgis. He is a psychiatrist also specializing in the field of electroencephalography. He is the only specialist in the latter field in the City of New Orleans... This doctor testified that the electroencephalogram is to the brain what the electrocardiogram is to the heart. In other words, the former records the electric activity of the brain by means of electrodes applied to the scalp surface with salt-paste. He stated that this type of examination was generally accepted as being accurate. He further testified that the electroencephalogram showed a depression of activity in the left temporal region of moderate degree which is considered strongly suggestive of localized brain damage. Such a showing by this test meant that it could be the result of a cerebral con *393 tusion or it would arise from other causes, in other words, it could have arisen as-the result of traumatic damage from the accident or it could have arisen from some other cause. This test is shown to be very valuable in epileptic cases. Dr. Posey explained the test as follows:
“I think it is important to explain on the record what we mean when we say' amplitude asymmetry, that is what is contained in the report. The two sides, the two halves of the brain commonly put out electric waves of the same general height-; they are symmetrical. When they are not symmetrical, that means something is wrong, you see. So, an amplitude asymmetry in our hands is an abnormal finding. Do I make that clear?
“Q. Suggestive of brain damage; is that equivocation based upon a possibility of a different interpretation which may be placed upon the report that you received from your machine? A. Not a different interpretation, rather the fact that 'there are certain individual variations for which we have to allow so that experience has taught us not to be too positive in reporting an opinion of a finding. It is more or less, you might say, on a statistical, basis. We would say that that finding is most. commonly associated with focal brain damage, but we concede, as perfectly possible, that we will come along and find someone who. does not have a focal brain damage and does have that finding, but, from our experience, it is very strongly suggestive of a focal brain damage.
“Q. Assuming that there is focal brain damage , in . this patient, what could be the cause of the focal brain damage? A. It could be due to mechanical injury to the skull, it could be due to a ruptured blood vessel arising out of high blood pressure, or other disease; it could be due to a brain tumor, cancer. It could be due to residual of the scar that is left by meningitis.1 There are a variety of possible causes.
“Q. In your diagnostic impression you used the words: Left temporal down moderate. Does that have any significance, the use of the word ‘moderate’ that is, with respect to the diagnostic impression? A. Yes, it does. If I had said ‘severe’, I would have then changed my report from ‘very strongly suggestive of localized b.rain damage’ to ‘presumptive brain -damage’, which in our terminology is considered to mean that the damage is much more likely there.
“Q. Now, Doctor, is there any room for difference of evaluation between specialists in your field? I am speaking of the EEG field? A. Yes, certainly, just as in any one of the medical specialties there are bound to be differences of opinion.”
Therefore, from the above testimony this test is riot positive, as one who had received no trauma to the brain might have the same finding as one who had. Dr. Posey frankly stated that there was another school of thought in this field which would have diagnosed the recordings as “suggestive” but that those who belong to his school of thought would - have diagnosed and used the words “strongly suggestive of localized brain damage” in the left temporal region. ■
Dr. Howard H. Karr, a neurosurgeon in the City of New Orleans, testified on behalf of the defendant in this case. He stated that the patient gave the following history; and complaints: 1
“This patient entered the office and stated ‘I suffer with my head’.. . The patient states it ‘stays sore all the time,’ and he points .to the left zygomatic region and left malar region. He also states if he ‘bow my head oyer it- starts to thump right in here,’ .and he indicates the left anterior temporal -region and the right and left frontal region. He also states that the left parietal region stays sore all the time. He states also ‘my eyes they worries me- all' the time.’ T have a roaring in the left side of my head and if I--just ordinary-be talking that roaring just comes there *394 and I be deaf.’ He states that is all that bothers him— 'just my head and my eyes.’ He states sometimes ‘I can’t walk around because it is right in here,’ and he then adds that it ‘thumps’ in the forehead. He states, ‘It don’t bother me no other way than the way I just told you just now. I got hurt in this wrist but it got recovered all right,’ and he indicated the left wrist. ‘It don’t happen too often but I feel like I’m smothering right here in this left side,’ and he points to the left pre-cordial region. When asked to state any additional complaints, he stated, ‘I told you all my complaints.’ He states, ‘You know my face was broke down in here,’ and he points to the left side of his nose. ‘This trouble been on me ever since I been in this explosion.’ ”
His physical examination revealed the 'following:
“Examination revealed a 45 year old colored male, well developed and well nourished who showed no signs of acute distress or chronic illness.
“The local examination of this patient revealed the following findings: A large scar on the posterior aspect of the distal one-third of the right thigh which was due to an injury sustained during childhood; this scar is rather extensive and adherent to the underlying muscles. 2) On the volar aspect of the proximal one-third of the right forearm there is some pigmentary loss, apparently due to a burn, but this does not involve the full thickness of the skin. 3) There is suggestion of some prominence of the zygomatic arch on the left side; however, there is no associated observable facial deformity or alteration in the jaw movement; 4) The retinal arteries show some increase in light reflex. 5) The blood pressure was found to be 160/110.
“The neurological examination disclosed the following: There was no clinical evidence of increased intra-cranial pressure on examination of the fundi oculi.
“The motor examination revealed normal speech, posture and gait. There were no involuntary movements and no fibrillary twitchings. The associated movements were intact. ' The finger-to-nose and heel-to-shin tests were normally performed. The power was normal and equal in both sides and the muscle tone, nutrition and consistency were within normal limits. There was no atrophy.
“The sensory examination revealed normal responses to touch, pin prick, position, vibration, figure writing and stereognosis. There was no swaying in the Romberg position.
“The reflexes were active and equal and considered to be within physiological limits.
“The sympathetic system revealed normal skin temperature and sweating.
“As a result of the examination, I concluded that the examination failed to disclose any residual disability as a result of the injury which he described as having occurred in October, 1951.”
Dr. Karr attributed the throbbing and roaring in the plaintiff’s head to possibly hypertension, and he testified very positively that he concluded that “the patient did not have residual injury to his central nervous system.” He also testified positively that if plaintiff had sustained a brain injury of an irreversible or incurable character he would have expected to find some objective evidence of it, which he did not.
As to Dr. Posey’s report of suggested brain damage as shown by the electroencephalogram, Dr. Karr stated that it did not change his opinion in any way, and he gave his reasons as to why it did not change his opinion as follows:
“Well, one, the test itself had been carried out a year prior to my examination, which is not a determining factor, but I simply make that comment because it had been carried out a year earlier. Even if it had been carried out on the same day of my examination, it would not have altered my opinion, because the electroen *395 cephalogram is a laboratory instrument of an experimental character, the value of which has been limited as a diagnostic aid primarily in cases of epilepsy and not otherwise. In other words, it is an instrument that will give a recording that may have some significance in cases of epilepsy, or obscure cases of epilepsy, where it will help to better categorize the type of epilepsy, but in itself cannot establish that the case is one of epilepsy or is not one of epilepsy.
“For example, there are many cases of known epilepsy that we have seen that had had electroencephalograms that were reported to be normal, but the fact remains that we have seen the patient with the fits, and the question comes up, ‘Are you going to believe the electroencephalogram, or are you going to believe what you actually saw with your eyes?’ Now, so much for its value in cases of epilepsy.
“As far as its use is concerned for the diagnosis of neurological diseases, there is no neurological disease that we are familiar with today that we were not familiar with prior to the invention of this machine. This machine is primarily and strictly one which is used in the laboratory in connection with animal experimentation. It is not a reliable diagnostic tool in its clinical applications; for example, in the determination of brain tumors, the extent of brain injuries, or a determining factor in the course of treatment to be carried out in a patient with any of those conditions.
“We have electroencephalograms made on every patient with a head condition admitted to our service at Charity Hospital, and we have attempted to correlate the electroencephalographic findings and our operative findings, and up to this point we do not rely upon this machine.
“From a technical point of view, I think I should say that, in the last analysis, that it simply records electric voltages from the surface of the brain; and to reflect the physiology of the entire brain in an attempt to interpret surface recordings is a thoroughly unscientific approach, if those findings are going to be used as a basis for a final conclusion regarding the patient.”
Dr. Karr was specific in his testimony that there was no comparison between the electroencephalogram as a diagnostic aid and an electrocardiogram in that the latter was much superior. He testified that even where the electroencephalographic examination is available, medical specialists in his field primarily rely upon clinical neurological findings. Dr. Karr’s testimony appears to be based upon logic and reason in contrast to some of the erroneous bases for the conclusion of Dr. Kirgis. It is true that Dr. Karr did not find a limitation of sensation or hypoesthesia which all the other doctors testified they found. His explanation of this was that the determination of sensation was strictly a subjective response on the part of the patient. In view of the fact that such a finding had no connection under the medical testimony with the alleged brain damage it is of relative unimportance.
Dr. Karr summed up his beliefs with regard to the value of the encephalogram when under cross examination he stated:
“Q. Now, as a neurosurgeon, if you found on examination of the patient that he did have the symptoms of a brain injury, and you sent him to have this test made, and it came back positive, that would be information that you would use, would it not, in confirming and assisting you in reaching a conclusion, or ■ would you just disregard it entirely? A. No, I wouldn’t disregard it, but if I felt that the patient had — that’s just the point of this whole thing — if I felt the patient had been the victim of cerebral contusion, and that was confirmed by this machine, then the machine would not have thrown any light on the- case, as far as I am concerned. I mean, it would simply be a matter of record that here is a diagnostic aid that confirmed the clinical impression; but by *396 the reverse, take a patient who appears perfectly normal in all respects, and then subject him to this test, and the test com.es back with a very vague term called ‘Suggestive evidence of brain damage,’ I would only laugh at the report, because my next question would be to the electroencephalo-grapher, ‘Well, what is the application of this term that you use, “sugges-' tive” ?’ First of all, -the term ‘suggestive’ means nothing, and, in the second place, what does he mean by brain damage? What is the alternative suggestion ?”
Dr. Karr, according to his testimony, found no neurological deficits of any kind and therefore .concluded that plaintiff had not sustained' irreversible brain damage at the time' of the accident. Fie. stated that, even assuming that he had a period of unconsciousness after the accident, it was not of sufficient severity and length of time in which to say that plaintiff could have -an irreversible brain injury when a ■specialist also considered the negative result of the neurological examination. His final conclusion .-was that plaintiff had no treatable complaints and no condition which required treatment and that he was physically qualified to resume his normal activities.
This court in .its opinion of remand quoted the following from Gray’s .1949 Attorneys Text Book of Medicine: ,
“Brain injury from direct trauma may lead to serious disturbance clearly evident upon electroencephalographic study. Immediately after injury, findings usually parallel those to be expected with the symptoms presented. Marked reduction of activity results from coma and is indicative of grave prognosis. Spasmodic muscular action leads to sharp spikes coincident therewith. A normal electroencephalogram indicates that little or no brain injury occurred even in the presence of conr siderable fracture unless of the frontal area. Major destruction may then produce little change, because large areas of the frontal -lobes apparently have never yet developed functions of importance. They are the silent areas of the .brain,
“Abnormal electroencephalographic records are to be expected in the presence of damage to other parts of the •brain. • Should positive findings continue long after injury, particularly with a history' of coma, the outlook is very grave. It is probable that lacerations have lead to connective tissue adhesions between the cortex and the covering meninges, or that overgrowth of the supporting, connective tissue framework within the brain itself is causing irritation leading to abnormal neuronic discharge. The inherent pendency of abnormal .connective tissue to contract as time goes on results in continued irritation.
“The electroencephalograph may demonstrate the exact locality of the irritative lesions, permitting surgéry with greater surety of success. However, confirmatory objective symptoms .ordinarily permit determination more accurately. While electroencephalographic studies confirm such diagnostic conclusions, this agency has not established a new method of sufficient certainty to replace careful clinical observations.” (Emphasis added.)
It is to be -noted that in the last paragraph of the above quotation that the “electroencephalograph may demonstrate the exact locality of the irritative lesions * * *. However, confirmatory objective symptoms .ordinarily permit determination more accurately * * and that while electroencephalographic studies “confirm such diagnostic conclusions, this agency has not established a new method of sufficient certainty to replace careful clinical observations.”
The emphasized portion of the above quote is in line with Dr. Karr’s opinion of the value of the electroencephalograph.
In addition, the able district judge in his written reasons stated:
*397 “Upon the two days on which this case was tried before me originally I observed very closely this plaintiff’s activities and attitude and at the close of the trial on March 17, 1953, I was thoroughly convinced that at that time there was very little, if anything, the matter with this plaintiff. In order to be entirely fair with this plaintiff and to give him a liberal construction of the evidence and the medical reports I based my judgment partly on the report of Dr. Kirgis which seemed to be most favorable of' the medical reports to this plaintiff. Dr. Kirgis gave his ' deposition in this-'case in November,' 1952, in which he testified at page 12 that in his opinion the plaintiff’s prognosis was good, not necessarily for complete clearing of his complaints, but for some clearingof the complaints and for his becoming able to return to work. In fact, this doctor throughout his testimony,, including .his deposition since the case wa-s remanded, encourages the plaintiff to be more active and try to do some kind of work. The trial was completed a'nd judgment rendered on March 17, 1953. In November when Dr. Kirgis gave his first testimony he stated at that time that if the plaintiff would go back to work, starting with light duty, in three months after he would be at work that 'he'would actually complain relatively' little spontaneously.’ Up to March 17th when the trial was completed this plaintiff had not only not worked but' he had not even tried to work. There-, fore, I gave him the benefit of the time from November when Dr. Kirgis testified to March 17th when the trial was completed to begin light work and adding three months from that time I gave judgment for compensation to June 23, 1953, when the plaintiff should have been able to resume his regular employment.
“It is singular that in a review of the evidence, in -this case I find that every doctor has expressed an opinion that at the times- of' the Respective ex-. aminations each of these doctors believed he was’ éither thén able -to return to work or soon would be. This type of testimony is given by Dr. Ban-nerman, Dr. Dow.ell, Dr. Forman, Dr. Phillips, Dr. Coffee, Dr. Kirgis, and Dr. Mayer and now to that has been added the additional .testimony of Dr. Kirgis who still says that the neurological findings on Betz are no different than they were on August 26, 1952, 'when he first examined him.
„ * ... .* * '--1= * •; * ■
■ “After heading .the new evidence and ■a're-study of all of the-evidence in this case, I am still exactly of the same ...opinion entertained by me oh March 17, 1953. The report of'the findings of the electroencephalogram are not positive.
They are merely suggestive of a brain injury and the dependability of that machine apparently is a’matter of controversy and dispute- amongst profes- ’> sional men. Dr. Kirgis thinks the'machine is of assistance and dependable and considered reliable. Dr. Karr, an eminent neuro-surgeon of New Orleans, testified that not only as a result of his examination of the plaintiff he concluded that there was no residual disability as a result .of the injury, but, further that the electro-encephalo-gram 'is' a láboratory machine of an r experimental character, the 'value of which has been limited as a diagnostic aid primarily in cases of epilepsy and not otherwise.’
^ * *
.! -“With every part of the evidence- except the plaintiff’s' own attitude of unwillingness to ever try to work indicating that- this plaintiff should have returned to do some kind of work more than a year and a half ago, I am convinced that the litigation which this plaintiff has invoked against third persons for damages is having its influence on the plaintiff’s willingness to make some effort to better himself.”
. Finding no manifest error in the judgment of the District Court it is hereby affirmed.